Good morning, your honors. David Merchant on behalf of Willie Sequi. I am also employed by the Federal Defenders of Montana. I'm out of the Billings Division. I see that the court has granted 15 minutes to me. I would reserve 5 for rebuttal. We argued three different issues, your honors. The third being the reasonableness of the sentence. I'm going to just briefly address that. This is a 59-year-old man now. He is a first-time offender. The offense was six years prior to the prosecution. He received 170 months. The projected release date for this gentleman is going to be October 16, 2019. He'll be 70 years old for this offense. The other two issues are, in my opinion, significantly more important. In this case, and I was trial counsel, the jury asked a question. Very straightforward. Can we get a transcript of Jackie's testimony? That's the alleged victim in the case. Specifically, we would like to read her recap of the incident. We want to read about the encounters on the log, on the porch, and I think they meant the balcony, and in the lower-level bedroom. The court decided, and at that point the jury had been deliberating for approximately five hours, the court decided that it was going to adjourn for the day and play back the testimony rather than reread the testimony. And the next morning, we reconvened. The court did everything right up to this point. They had all the parties in there. They answered the question. They played the tape back in open court. There was a limiting instruction. All of that was right. And all of that comes out of the decisions previously made. In fact, Judge Rawlinson, your decision last October in Ramsey, and the previous decision in Sandoval, we had the court doing it right. But how the court did functionally was they had a little portable radio, commonly referred to as a boom box. They placed it at the edge of the clerk's table, and they played it to the jury. And the court, where I sat and where the prosecutor sat, and we have both trial counsels here, I couldn't hear part of that tape. I had objected to the playback. I had objected to the other parts of it. And the court, in fact, said, you know, Mr. Merchant, Mr. Babcock, I have your objections. You've preserved this. The government, I'm sorry. You didn't say on the record, or maybe just said to the other counsel, I'm having trouble hearing this, or isn't that a problem? But you didn't make an objection to the court, did you? I did not. And primarily the reason was we had been told the night before we had objected. We had been told again, objecting that morning, you've objected enough. And quite frankly, I think that I preserved the objection. The judge was getting tired of me saying that. I let it go. But that's a different objection to say, it's not really an objection. It's just information to the court. You know, the trial court would have been, I suspect, interested in knowing if the tape was not audible to one or more of the participants. So that's a different objection than saying I object to the readback in the abstract, as opposed to the readback is not audible. With all due respect, I agree with you. It is a different objection. But at that point, I think I had done what I needed to do. And if that is the mistake, then it is my mistake. And that should not be held against Mr. Seekler. Well, we often hold what counsel does against the other side. I shouldn't be in this case. Now, part of it was quite audible, apparently. And would we maybe do a harmless error analysis? What really was lost to the jury in this part that wasn't? The answers were there, but not the questions. That's the fundamental difference between direct examination and cross-examination, Your Honor. Direct examination is the open-ended question where the witness tells their story. Sure, I understand that. But what in this cross-examination was a problem? The jury specifically asked to hear the victim's recalling of the incident in three different spots. During the second part of the cross-examination, the cross-examination was divided up and broken by lunch. During the second part of the cross-examination, quite frankly, I went through piece by piece by piece of that incident, where all she was answering was yes or no, agreeing with me or I don't know. That was exactly what the jury had asked for. And in my opinion, frankly, there was a story that was fairly convoluted. There should have been other witnesses. It went to the credibility. And there was a credibility question, Your Honor, where she had made an allegation against another person at the same time. And even the government didn't believe that because they didn't charge that person. So there was a credibility question. And what I, as defense counsel, thought was the difficulty in her story. So I think that the jury didn't get the cross-examination. Can you be specific and tell us what questions were asked that just got a yes or a no that would have been helpful to your client? Well, Your Honor, I believe in my brief at page 17, I go through some of those questions. It is going to be at Exhibits of Records 259 and 260, where it goes through where she had indicated that she had left the outside, had gone upstairs, had walked out on the balcony or the porch. She had allegedly gone through and passed everybody that is at this gathering. She's on the outside porch with her cousins. And the cousins testify they didn't see anything. That she's sitting on his lap, that he inappropriately touches her at that point, that he tongue-kisses her. She then gets up. She walks back through where her mother would have been, where all the other uncles and aunts and cousins would have been, walking downstairs into a basement. And Willie Siecki follows her through that down into the basement. That was what I was questioning her about, whether she was agreeing or disagreeing. I think that goes to the whole story, whether her story is credible or not. Were the questions that, did you walk through all these people? Who did you see? What did you do? Yes, I did. And again, it's at Exhibits of Records 259 and 260. Judge Rawlinson, you had a question? I was going to ask you, did the jury indicate in any way that it was having difficulty hearing? Not that I'm aware of. But here's the key to that. Also, during the sentencing hearing, I raised this issue that this was a problem and part of my motion for a new trial and the bond pending that. The government even admitted they couldn't hear, and they guessed 25%. I don't know if that's right or not. When I went through and listened to this audio tape on my computer in my office, I estimated closer to a third, about 33%. The question becomes, this court has set out a standard. And I guess, frankly, I'm asking for a blue line rule today. Whenever the court has said in readback or playback, it has to be the entire testimony. This court wouldn't allow a court reporter to stand up and read from the transcript and then just simply leave parts out. It wouldn't do that. Why should it then do it for an audio playback? But you're arguing structural error. I'm sorry, sir? You're arguing structural error. Yes, Your Honor. No prejudice. Well, I don't know if it's prejudice or not. I know that the jury was out for a little over five hours, had the question, and then they came back in 50 minutes the next day. So, again, it emphasized the undue prejudice. What we were trying to do was eliminate undue prejudice by eliminating prejudice. I don't think you heard my question. Okay. I understood my question. There are two ways to go. One of them is to say we don't care about whether there was any prejudice from the failure of the jury to hear the questions on cross-examination. And that's what we call structural error. It's sort of like it turns out there are a few things that are structural error. It turns out the judge is bribed. No, that's structural error. And the Supreme Court has come up with a short list of things that are structural error, and this is not on the list yet. So you can either say structural error, we don't have to look at prejudice, or you can address the question of prejudice. You can actually say here is how we were damaged. And, you know, you say, well, you want some sort of per se rule. I heard you say you want a per se rule. I don't know what this per se rule is. It must be the entire testimony. If there's any question that we're left with. Let's say that is the rule. So what? You still have to overcome prejudice. If a rule is not followed, let's say that is the rule, then the whole thing has to be read. And let's say there was error here. And let's even assume that you objected enough to preserve the error. You still have to show prejudice. Are we on the same page, you and I? We are, Your Honor. So saying I want a per se rule doesn't get you, doesn't even begin to answer the question that my colleagues have been asking you about, which has been focusing on prejudice. We're accepting your idea for the purpose of this argument that there is such a per se rule. You still have to point to something that says here's how my client was damaged. And I'm looking at the, you pointed to pages 259 and 260 of the transcript, and I am looking at those pages and I frankly don't see anything at all in those questions that it's not like you ask a question and say you are truly lying to the court, and she says, yes, I am. There's nothing like that. There are questions like, and he has you sed, and that is when he kisses you. And she says, yes. Well, that is not a question that's helpful to your client. So if the jury didn't hear it, it was probably to your client's advantage. So what I would like you to do, do you have pages 259 and 260 in front of you? I do, Your Honor. Well, no. No, no, no, I don't want you to do that. I want you to take pages, what I want you to do is look at pages 259 and 260, which you have in front of you now and I have in front of me now, and by citing page and line, I want you to tell me which of these questions was helpful to you, such that if the jury had heard it and would presume that you didn't hear it, the absence of the question would have been damaging to your client's case. I understand. I don't want to hear anything else out of your mouth. I understand. I don't want to hear anything else. If there is nothing, then you can say nothing, but the only thing I want is for you to point to me chapter and verse, page and line, where a damaging question is asked, where a question is asked that's helpful to your client. Well, then, with all due respect, Your Honor, I would start reading at the beginning of the cross-examination that afternoon, because it puts it in context. I don't want to read the whole thing. I want you to point out to me the question that is the most helpful to your client, which if overheard, I think the one I read is not the one that you are talking about, and he has you sit and that is when he kisses you, right? That's not the one, right? No. Or the one that says, how many bedrooms are there in the basement? That's not the one, right? That's not. Or how about, do you know whose bedrooms there were? That's not the question, right? No. Or, I mean, I'm looking for this, and none of this stuff is helpful. I mean, it's cross-examination. It's not particularly good or helpful cross-examination or expert or what we call effective cross-examination, but it is cross-examination. But I don't see where anything here, the overlooking of any of this, could have possibly prejudiced your client. That would certainly allow – I would certainly concede that if your opinion is that this is ineffective and doesn't go to the point, that may be true to you. But in my opinion – But I'm wanting to be persuaded. This is why you are there standing to persuade me otherwise. I haven't found anything with your general citation to pages 59 and 60. I haven't found anything. But I would like you as the advocate for your client to show me where I'm wrong. And just telling me start reading pages on your own and you'll find it doesn't help. It's not helpful to your client. Well, then let me try to rephrase what I'm saying. All right. Our position is simply this. During the direct, the victim says, this is what happened, these are where I went, that's what happened. During the cross-examination, I walked her through each one of those, putting the other people around her. So in context of the entire trial, and again, you're not trying to emphasize the testimony of one person. You have to look at it all because that's the limiting instruction. She says the other cousins are on the porch. The other cousins say, I didn't see any of that. She says these things happened. I walked through this room. Her parents are there. She didn't indicate to that. Nobody else corroborates any of the story. One of the problems that we had in this case was the credibility question. That was what we went for with this victim. And what the argument was, or what the question was, was we want to hear her story again. We want to hear where she goes and what she was doing. I don't know what the jury was thinking. But those questions could have been what the jury was looking to hear. We don't know the answer to that question. Counsel, I wanted you to address this refusal to allow the expert witness to testify. Thank you, Your Honor. A couple of extra minutes to do that for us. The two pieces of evidence in this case is we had a victim who said something happened and we had this confession. And our position was the confession was false, that it was untruthful. We did not have – we had Dr. Richard Leo come in. He read the documents. We talked to him. He interviewed our client. And he said, well, there's two problems. One is that he was promised leniency. The second is that there are things in the report and in the confession that are simply not true. Those are two indicia of unreliability. False confessions, while it's a fancy word that's bandied about with the innocence project and those kind of things, people – common people just don't simply know that. So a jury, in our opinion, had to be educated somewhat. We had an FBI agent who was going to testify that he did everything properly. What our position was simply that Mr. Seque was going to say something different and we wanted to be able to let the jury know. And what – I'm sorry. What do we do with the fact that you asked to have him talk with the officer and that was refused? Well, that was one of the things that Judge Nelson said was a problem, that you didn't know. In fact, what he said was, Dr. Leo had very limited knowledge as to the specifics of the questioning of the defendant by Agent Smedella, except for Record 88 in his order. Well, that's absolutely true because the government's the gatekeeper of whether or not our expert can talk to their officer. We couldn't ever satisfy that. They can always say, You can't talk to that. Plus, they didn't record it. They didn't videotape it. So we don't know what happened. We have two different versions. And one of the versions was ours that said, He made the promises. I wanted to get out of there. I was scared. We wanted somebody to be able to tell the jury that those things happened, that false confessions do exist. The government has said, I opened the door with the invited error by saying, Do false confessions exist in Agents Smedella? Saying, Absolutely not. They don't exist. Law enforcement doesn't believe that. The invited error doctrine that the government cites to in Perez actually goes to a jury instruction where the defendant's attorney left out an element. It doesn't go to the fact that I asked, What color is the sky? And the government agent says, Pink. It was such an unexpected answer that, at that point, I should have, I guess, renewed my contention that the expert should have been able to testify to say, Hey, no, law enforcement agrees. We have the FBI bulletin that says, Be careful of false confessions. At that point, a special agent of the United States who does carry some weight, I'm sorry, they simply do, says that this thing isn't true, that this is fictitious, that he did everything right. And then the government argued in their closing, that there was no force, there was no coercion, there was no gun held to his head. It can't be a false confession. Well, that's just simply not true. The information today is very different from that, that false confessions occur from a myriad of different things. And we just wanted to be able to explain that to the jury. Thank you. Okay, we'll hear from the governor. Good morning. Lori Sook, I represent the United States. I was trial counsel in this case. I will submit the sentencing issue and go right to the two other issues. The first issue, excuse me, that we've discussed today, is the issue regarding the playback of testimony. It totally was unexpected what happened, I think, to everyone in the courtroom. But what we don't have here is a record of what the jury heard or didn't hear. The jury, I can honestly tell you, sitting in the courtroom, I didn't hear some of the questions, but my reaction was to look at the jury to see what their reaction was, because I wasn't in the same position that they were in in the courtroom. Well, let's assume that the record was incomplete in the sense that they didn't hear all of it. All right, Your Honor. Then move on. Okay. If they didn't hear what was incomplete, there's still not a problem with this, because there's no case that specifically says that there's a bright-line rule that all of the testimony has to be played. Certainly Hernandez suggests that, but there are many cases, starting with King, going through Nickel, and Sandoval, and other cases where the entire testimony hasn't been played. Well, I think that we all agree that you're supposed to play the whole testimony, but I think what it turns on here is whether there was prejudice from their not hearing it. Exactly. But we can't determine prejudice here, first of all, because we don't know what the jury did or didn't hear. Even if we assume that there were things that they didn't hear, we don't know what they were. And in the cross-examination, in the view of the United States, we can't pinpoint a specific factor, a specific question, that would arise to the level of prejudice that would overturn this conviction. We have no record about what was missed in order to make a finding of prejudice, but even assuming that there were some things that were missed, there's nothing there. There's been nothing pointed to that shows this question, this line of questioning, this particular piece of evidence rises to the level of prejudice that should overturn this conviction. But did you look at every question where they claimed that they couldn't be heard? I did. Did you look at each one? I did, Your Honor. And was there any prejudice from any of those? Not that I could find, sitting in that question and the answer. But as I pointed out, not wanting to give facts to the jury, I mean, to the court here, it was hard for me because I could play this tape that they've submitted to you on different pieces of equipment, different volume, trying to figure out which question are they pinpointing that they couldn't hear. It's totally dependent on volume and quality of equipment. I can't tell you which questions the jury didn't hear, but I can't. They haven't identified what specific questions. Let me put the question this way. Assuming they heard none of the questions, zero. None. Yes. Was there prejudice? No. In this case, there was no prejudice because what was done here by the district court was exactly what has been done by other courts, and this court has affirmed them, where, for example, portions of testimony have been played, but a cautionary instruction was given, and it was done in open court. And so the district court here did everything right, did the best practices, and it does not rise to the level of prejudice. The jury here ---- So you don't actually defend the actual answers to the questions. You think that after the cautionary instruction, there would be prejudice. There could be a different situation that there could be prejudice here, but we have a cautionary instruction. We have an open court. Unlike in Richard, we have a jury that asked only for a specific portion of the testimony, and the court, its intent, and it thought it was doing it, was giving them everything versus the other way around. So when we're talking about undue emphasis on particular testimony, the court did everything here not to do that. I'm interested in this refusal to allow the expert to testify when the officer said there's no such thing as a false confession. This answer to the question was as much unexpected from the government as it was from the defense. That's right. It is. It's an absurd answer from this FBI agent, and we've talked about cross-examination here this morning. There are some ---- Your agents seem to give a lot of those sort of answers. Well ---- Happened in the prior case, too. It's interesting, Your Honor, what happens. Obviously, you know, in cross-examination and how as much as defense counsel may flinch, so does counsel for the government. And this certainly was not ---- When we prepare our witnesses, I didn't anticipate that we would be talking about false confessions with a government agent, and I certainly didn't expect that answer. But here's what's interesting about that. It's absurd. How did it help him? Counsel? Yes, Your Honor. When that answer came out, you could have said to the court, well, perhaps we should allow this expert to testify to the fact that there is such a thing as a false confession. Well, so could the defendant have, Your Honor. They certainly could have made a motion to have their motion to have an expert testify reconsidered at that point. They could have dealt with that as well. My opinion sitting there was that's a ridiculous answer, and the jury's not going to credit that. It was in the heat of a cross-examination, and it certainly was getting heated between Mr. Merchant and Special Agent Smedell. So I just don't think if it hurt anybody, it hurt the government. But it wasn't anything that the government anticipated, and I know the defendant certainly didn't anticipate. Probably what, if I was trial counsel on that side, what I would have done is tried to keep Special Agent Smedell talking to see actually how far he would go with this idea of his. Now, turning to another point, you wouldn't allow the expert to talk to the officer. So he didn't have all of the information one would like him to have as to what took place in the interrogation. He had his client's version of what happened, who was the only other participant in the interview. But the judge said that wasn't enough. Well, what the judge said was that what the defendant said occurred didn't fit into Dr. Leo's studies of what leads to false confessions. He said basically two things. He said that he was given a promise of leniency and that there were inconsistencies in the statements between the victim and the defendant. Well, starting with the last one first, that just wasn't really accurate. There were more consistencies, these glaring inconsistencies that Dr. Leo pointed, certainly weren't agreed upon by the district court. And as we've pointed out in our brief, there were many more consistencies. So then we go to the promise of lenient treatment, which was not fleshed out at all, simply a lenient treatment. That didn't fit into Dr. Leo's studies about generally these things occur with people that have mental disorders or mental disability, long, inordinately long interviews, juveniles. He was clearly an expert on techniques, and he had studied this, and his research was available to all of us. He couldn't fit in what he knew about what happened in this interview from his client, who could tell him just as well as Special Agent Smidala. If he had talked with the officer, might he have had more information that would have made it fit? It wouldn't, Your Honor, because the officer disagreed with these points that the defendant was making, that he had provided a promise of leniency, or that there were glaring inconsistencies in the statement. The officer simply disagreed with that. So it wouldn't have helped at all. It was, as often is the case when we're talking about a defendant and an agent talking about an interview, they don't agree on what occurred. And the jury heard that from both participants, exactly what had happened, and were able to make a determination based on their credibility and demeanor at the trial. This was simply a gloss of expertise in the view of the government on the defendant's testimony that was presented to the jury. Thank you. Unless you're out of time, I believe. I am out of time, Your Honor. The court would like to permit me with one minute. You can have a minute for a butler if you want to take it. Judge Nelson's order regarding the expert was very specific. He denied the expert because Dr. Leo had a very limited knowledge as to the specifics of the questioning by Agent Smidalla, and that the defendant can obviously present the circumstances of the interview to the jury to prove that he falsely confessed. It does not seem appropriate that we use an expert who is not present at the interview and only has the knowledge and circumstances of the interview based on what the defendant has told him. Is that what Judge Nelson said? Dr. Leo testified at the Dalbert hearing that there were two things. One is, actually there are three, Your Honor. One is that he started out by saying, no, I didn't do this, and it changed over the course of time. The second is that there was a promise of leniency. And the third is that there were multiple errors in Agent Smidalla's reports, and those are indicia of unreliability. He would have told that to the jury. That became a question of a cross-examination by the – by Agent Smidalla, and there was nothing to refute that except for Mr. Seekley, who obviously has a different story. It would have been important to have the expert. You did not renew your motion or ask for reconsideration after you got that answer from Agent Smidalla? I'm getting the impression that I should be more diligent and obnoxious in the courtroom. If I'm told by a judge once, I'm overruled. Because it's forceful and aggressive. It could be. But I thought at that point I had a written order that said no, plus Dr. Leo had gone. He had flown back to San Francisco. So I didn't have the opportunity to have him there. In fact, we took Agent Smidalla out of order on rebuttal because he had to leave also. But Dr. Leo wasn't there on Tuesday. He was there for the first day of trial. He was denied. He left. I didn't have the ability to recall him at that point. Thank you. Okay. Case resolved. You'll stand for a minute. We'll next hear argument in United States v. Sand Crane.
judges: Kozinski, Fletcher, Rawlinson